Laurence M. Rosen, Esq. (SBN 219683)
THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK YOUNGERS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>           Plaintiff,<br><br>-against-<br><br>VIRTUS INVESTMENT PARTNERS, INC., VIRTUS INVESTMENT ADVISERS, INC., F-SQUARED INVESTMENTS, INC., F-SQUARED ALTERNATIVE ADVISORS, LLC, F-SQUARED INSTITUTIONAL ADVISORS, LLC, F-SQUARED INVESTMENT MANAGEMENT, LLC, EUCLID ADVISORS, LLC, VP DISTRIBUTORS, LLC, GEORGE R. AYLWARD, MICHAEL A. ANGERTHAL, W. PATRICK BRADLEY, LEROY KEITH, JR., PHILIP R. MCLOUGHLIN, GERALDINE M. MCNAMARA, JAMES M. OATES, RICHARD E. SEGERSON, FERDINAND L. J. VREDONCK, FRANCIS G. WALTMAN, MARK S. FLYNN, HOWARD PRESENT, AMY ROBINSON<br><br>           Defendants,<br>           -and-<br><br>VIRTUS OPPORTUNITIES TRUST,<br>           Nominal Defendant | No. 15-3496 FMO (JEMx)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>CLASS ACTION |

1.     Lead Plaintiffs Mark Youngers, Kimball Lloyd, and Frances Briggs ("Plaintiffs") individually and on behalf of all other persons similarly situated, by their undersigned attorneys, allege in this Complaint the following upon knowledge with respect to their own acts, and upon facts obtained through an investigation conducted by his counsel, which included, inter alia: (a) review and analysis of relevant filings made with the United States Securities and Exchange Commission (the "SEC"); (b) review and analysis of Defendants' public documents, conference calls and press releases; (c) review and analysis of securities analysts' reports and advisories concerning the Virtus Investment Partners and Virtus Opportunities Trust; (d) information readily obtainable on the Internet; and (e) an investigation conducted by Plaintiffs' investigators.

## I.     Nature of the Action

2.     Plaintiffs bring this action as a class action and derivative action.

3.     The Class Action claims are brought on behalf of purchasers of Virtus Allocator Premium AlphaSector Fund Class A, C, and I shares (VAAAX, VAACX, VAISX), Virtus AlphaSector Rotation Fund Class A, C, and I shares, (PWBAX, PWBCX, VARIX), Virtus Dynamic AlphaSector Fund Class A, B, C, and I shares (EMNAX, EMNBX, EMNCX, VIMNX), Virtus Global Premium AlphaSector Fund Class A, C, and I shares (VGPAX, VGPCX, VGPIX), and Virtus Premium AlphaSector Fund Class A, C, and I shares (VAPAX, VAPCX, VAPIX) (the "AlphaSector Funds") during the period from May 8, 2010 through December 22, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"). In September 2008, F-Squared Investments, Inc. ("F-Squared") and its co-founder and former CEO Howard Present began to market an investment strategy they called "AlphaSector" (the "AlphaSector Strategy"). Present claimed that this strategy could beat the S&P 500. In addition, Present claimed that the strategy would detect early warning signs of a stock

market crash, and allow fund managers to pull out before incurring the worst of the losses. In the wake of the 2008 financial crisis, this strategy had obvious appeal. The only problem was that the strategy had no track record. In fact, a 20 year old college intern developed the strategy in 2008 and not a single dollar had been traded using that strategy. Present's solution was simple; he created a fake trading history for the AlphaSector Strategy, a trading history that showed AlphaSector pulling out of the market in time to avoid most of the losses in the 2008 financial crisis, as well as the 2002 bear market. This fake history also showed the AlphaSector Strategy significantly beating the S&P 500.

4.     The derivative action is brought by Plaintiff Francis Briggs, who has owned shares of Virtus AlphaSector Funds continuously since August 4, 2014.

5.     Present began pitching his strategy to several potential partners and clients. One of those was Virtus Investment Partners ("Virtus"), which was then a failing mutual fund company. Desperate for a winning product, Virtus partnered with F-Squared to create several mutual funds based on the AlphaSector Strategy, despite knowing that its advertised trading results were fabricated. This advertised strategy, which promised safety to an investment public still reeling from the events of 2008, was greatly successful in attracting investors and allowed Virtus to manage tens of billions of dollars.

6.     The fact that the AlphaSector Strategy's historical results were misrepresented to investors was widely known within Virtus. Peter Batchelar, Virtus' head of product management, discussed it openly in a conference attended by numerous employees, and employees referred to Defendant Howard Present as "Howie Backtest" to refer to the fact that the AlphaSector Strategy's so-called results were generated after the fact.

7.     Despite the widespread knowledge that the AlphaSector Strategy was fabricated, no defendant disclosed this knowledge to investors at any point during the Class Period. Instead, Virtus, over time, quietly removed references to the

AlphaSector Strategy pre-2008 results from its marketing materials. This, however, did nothing to inform investors of the fraud and only serves to further demonstrate Defendants' scienter.

8. During the Class Period, Defendants offered and sold mutual funds to plaintiffs and the Class based on the false and misleading trading strategy, misrepresenting that it had a highly successful track of earning impressive investment returns.

9. The securities claims allege Defendants' misrepresentations and omissions of material fact concerning their bogus trading strategy breached their duties of complete and accurate disclosure to mutual fund investors in violation of the federal securities laws.

10. Due to Defendants' fraud, which was not revealed to investors until it was reported in the press in September of 2014, Plaintiffs invested in sub-par mutual funds that significantly underperformed the S&P 500. As a result of the mutual funds poor performance, plaintiffs and the Class have been damaged.

11. The derivative claims assert that Defendants, as Officers, Trustees, advisors, sub-advisors, and managers, breached their fiduciary duties by utilizing an unproven and ineffective strategy, concealing from investors that the strategy was based on false results, and allowing F-Squared, with a track record of deception, to manage investor funds.

## II. Jurisdiction and Venue

12. The claims asserted herein arise under and pursuant to Section 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5), as well as Sections 11, 12(a)(2), and 15 Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§77k, 77l(a)(2) and 77o, as well as Delaware law.

13. This Court has jurisdiction over the subject matter of the claims brought under the Exchange Act pursuant to § 27 of the Exchange Act (15 U.S.C.

§ 78aa), and has jurisdiction over the subject matter of the claims brought under the Securities Act pursuant to 28 U.S.C. § 1331 and § 22 of the Securities Act, 15 U.S.C. § 77v. This Court has jurisdiction over state law claims pursuant to 28 U.S.C. § 1367 because this Court has original jurisdiction over the Securities Act and Exchange Act claims, and the state law claims set forth herein are so related Securities Act and Exchange Act Claims that they form part of the same case or controversy.

14. This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 and there is diversity of citizenship between the parties. Plaintiffs are citizens of California, Texas, and Kansas, and no Defendant is a citizen of any of those states.

15. Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b) and 22 of the Securities Act as Defendants did business in this districts.

16. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

### III. Parties

#### A. Plaintiffs

17. Plaintiff Mark Youngers purchased AlphaSector Fund securities during the Class Period and has suffered damages as a result, as set forth in his PSLRA certification previously submitted to the Court.

18. Plaintiff Kimball Lloyd purchased AlphaSector Fund securities during the Class Period and has suffered damages as a result, as set forth in his PSLRA certification previously submitted to the Court.

19. Plaintiff Frances Briggs purchased AlphaSector Fund securities

during the Class Period and has suffered damages as a result, as set forth in his PSLRA certification previously submitted to the Court. She has been a shareholder of AlphaSector Fund securities at all material times alleged in this Complaint, and will continue to be a shareholder of AlphaSector Fund securities until the conclusion of this litigation.

**B.    Nominal Defendant**

20.    Virtus Opportunities Trust ("VOT"), a SEC-registered investment company is a Delaware statutory trust which issued registration statements and other public filings for the funds. VOT is the Nominal Defendant in this Action with respect to all derivative claims.

**C.    Defendants**

21.    Defendant Virtus Investment Partners, Inc., ("Virtus") is incorporated under the laws of the Delaware. Virtus' stock trades publicly on the NASDAQ stock exchange under the symbol "VRTS." Virtus also solely owns and controls Defendant Virtus Investment Advisers Inc. ("VIA"), its subsidiary, which is an SEC-registered investment adviser with several of the same officers and directors. VIA is the investment adviser for VOT.

22.    Defendant Euclid Advisors LLC is an investment manager and affiliate of Virtus, and was subadvisor to the AlphaSector Funds during the Class Period.

23.    Defendant VP Distributors, LLC was underwriter of the AlphaSector Funds during the Class Period.

24.    Defendant George R. Aylward ("Aylward") is and has been since 2008, Chief Executive Officer and President of Virtus. He was also the President, Chairman and Director and a control person of VIA and since 2006 has been the President and Trustee of VOT. Aylward signed VOT's registration statements throughout the Class Period.

25.    Defendant Michael A. Angerthal ("Angerthal") is and since 2008 has

been the Executive Vice President, Chief Financial Officer and Treasurer of Virtus.

26.    Defendant W. Patrick Bradley ("Bradley") is and since 2006 has been the Chief Financial Officer and Treasurer of VOT.

27.    Defendant Leroy Keith, Jr. ("Keith") was from 2000 to 2015 a trustee of VOT, and signed each of VOT's registration statements throughout the Class Period.

28.    Defendant Philip R. McLoughlin ("McLoughlin") is since and since 1999 has been a trustee of VOT, and signed each of VOT's registration statements throughout the Class Period.

29.    Defendant Geraldine M. McNamara ("McNamara") is and since 2001 has been a trustee of VOT, and signed each of VOT's registration statements throughout the Class Period.

30.    Defendant James M. Oates ("Oates") is and since 2000 has been a trustee of VOT, and signed each of VOT's registration statements throughout the Class Period.

31.    Defendant Richard E. Segerson ("Segerson") is and since 2000 has been a trustee of VOT, and signed each of VOT's registration statements throughout the Class Period.

32.    Defendant Ferdinand L. J. Vredonck ("Vredonck") is and since 2005 has been a trustee of VOT, and signed each of VOT's registration statements throughout the Class Period.

33.    Defendant Francis G. Waltman ("Waltman") was from 2003 to 2013 Senior Vice president for Product Development and from 2013 to the present Executive Vice President at both Virtus and Virtus Opportunities Trust, in charge of Product Development. He is also the Executive Vice President and Director and a control person of VIA.

34.    Defendant Mark S. Flynn ("Flynn") is and has been since 2011 the Executive Vice President and General Counsel of Virtus. He is also the Executive

Vice President, General Counsel and a control person of VIA.

35.    Defendant Howard Present ("Present") was CEO of F-Squared from 2005 to 2014 relevant times and was portfolio manager of the AlphaSector Funds from 2009 to 2014 during the Class Period.

36.    Defendant Amy Robinson, ("Robinson") a Managing Director of Euclid since September 2011, has been a portfolio manager of the AlphaSector Funds since 2009.

37.    Defendants George R. Aylward, Michael A. Angerthal, W. Patrick Bradley, Leroy Keith, Jr., Philip R. McLoughlin, Geraldine M. McNamara, James M. Oates, Richard E. Segerson, Ferdinand L. J. Vredonck, Francis G. Waltman, Mark S. Flynn, Howard Present, and Amy Robinson shall be collectively referred to as the "Individual Defendants."

**D.    Stayed Parties**

38.    F-Squared Investments, Inc. ("F-Squared") is an investment adviser. In October 2008, F-Squared launched its first AlphaSector index, and is an affiliate of Stayed Defendant F-Squared Alternative Investments, LLC, subadvisor to the Virtus Dynamic AlphaSector Fund as well as Stayed Defendant F-Squared Institutional Advisors, LLC, subadvisor to the other AlphaSector Funds. F-Squared is owned by Stayed Defendant F-Squared Investment Management, LLC. The defendants listed in this paragraphs were named as Defendants in the Initial Complaint in this Action, but pursuant to their pending bankruptcy, all causes of action against them are stayed.

**IV.    Fraudulent Conduct**

39.    Prior to December 2008, Virtus was a subsidiary of Phoenix Companies, Inc., ("Phoenix"), a life insurance and annuity company. Virtus was struggling at the time due to the financial crisis, and its assets had declined 50% in 2008.

40.    Phoenix sold Virtus off in an IPO at the beginning of 2009, and

Virtus' shares began trading on NASDAQ Global Markets, with an initial market capitalization of $57 million. Then, on April 10, 2009, Virtus reported in its Form 10-K for the year 2008 that it would be required to take a $529 million impairment charge, an amount more than 800% greater than its market capitalization. At this point, Virtus was desperate to turn its fortunes around, and in the fall of 2009 began partnering with F-Squared.

41.     Howard Present founded F-Squared in 2006 in order to develop and market a quantitative investment product called AlphaCycle, according to the SEC's "ORDER INSTITUTING ADMINISTRATIVE AND CEASE-ANDDESIST PROCEEDINGS PURSUANT TO SECTIONS 203(e) AND 203(k) OF THE INVESTMENT ADVISERS ACT OF 1940, AND SECTIONS 9(b) AND 9(f) OF THE INVESTMENT COMPANY ACT OF 1940, MAKING FINDINGS, AND IMPOSING REMEDIAL SANCTIONS AND A CEASEAND-DESIST ORDER" in the matter of F-Squared Investments, Inc., Administrative Proceeding No. 3-16325 (the "SEC F-Squared Order" which is incorporated by reference as if fully set forth herein, including Appendix A thereto). The SEC's Complaint against Present (the "SEC Present Complaint" which is incorporated by reference as if fully set forth herein) explained that F-Squared suffered massive losses in the first half of 2008, and as of July 2008 had only generated $189 in fees for the calendar year, suffering a net loss of $609,000.

42.     In his attempts to save F-Squared, Present had several conversations with David Morton, a Boston area based wealth management advisor, trying to enter into a joint venture with the AlphaCycle product. Morton instead pitched Present on a sector rotation strategy, which interested Present. Morton disclosed to Present that a 20 year old college intern named Corey Hoffstein was working on several products, including an algorithm that analyzed price trend and volatility data in order to make buy/sell recommendations for investments. Morton intended to license the product through a company that he and Hoffstein founded called

FIRST AMENDED COMPLAINT

Newfound Research. Present entered into a licensing agreement with Newfound Research to use the trading strategy and branded this strategy AlphaSector.

43.    In February of 2009, F-Squared contacted Virtus to pitch AlphaSector, calling it a "proprietary analytical engine" and claiming that it had "consistently outperformed the benchmark S&P 500 since its inception in April, 2001."

44.    The AlphaSector Strategy was referred to by F-Squared as an "ETF sector rotation strategy." This meant that the AlphaSector strategy consisted not in investing in stocks directly, but in exchange-traded funds, or "ETFs", which are a type of mutual fund that, unlike a traditional mutual fund, can be bought and sold on the open market like an individual stock. The AlphaSector strategy involved investing in nine separate ETFs, each of which was devoted to a particular sector of the economy.

45.    The AlphaSector Strategy rests on an algorithm that interprets market data, converting it into recommendations, or "signals" to buy and sell securities.

46.    In order to better market the AlphaSector Strategy, Defendants developed two indices – the AlphaSector Rotation Index and the Premium AlphaSector Index (the "AlphaSector Indices"). An index is a basket of securities used to measure the performance of the market or some aspect of it. In the case of AlphaSector, the Indices represented the securities recommended by the AlphaSector strategy. F-Squared stated in marketing materials throughout the Class Period that the AlphaSector Indices are "based on an active strategy with an inception date of April 1, 2001. Inception date is defined as the date as of which investor assets began tracking the strategy." Therefore, F-Squared was asserting that the AlphaSector Indices historical results were not merely a hypothetical calculation of how the AlphaSector Strategy *would have* performed. F-Squared instead asserted that the AlphaSector Indices show how the strategy *did* perform since April 2001 and that the strategy had been used to invest actual investors'

assets.

47.     In reality, however, these results were false. Instead of being based on real trading results, the "historical" performance was merely an after the fact simulation conducted in 2008 in an attempt to estimate how the trading strategy would have performed had it been executed in 2001 through 2008, a process called a back-test. All results prior to October 2008 were generated solely by a "back-test", meaning that rather than reflecting real historical trades, they reflected an after-the-fact simulation of trades conducted by F-Squared in 2008.

48.     A back-test of performance results is of limited utility because, with the benefit of hindsight, it is possible to identify trading strategies that would have been successful in the past, but are no more likely than chance to be successful in the future, because they are based on coincidence, not underlying market forces. For instance, it might be that stocks with a ticker symbol with the letter "g" in the name traded better over a certain period of time than those without a "g" in their name, simply by random chance.  Under a back-test, such a strategy would then appear to be effective.  But such a result is meaningless because the results are obviously coincidental.

49.     In addition to concealing that the results were back-tested, Defendants also concealed the fact that the back-test was performed incorrectly and contained a performance error, leading to grossly inflated results – more than 350%, a fact that F-Squared has admitted in Appendix A to the SEC F-Squared Order.

50.     From the outset, the AlphaSector Strategy was marketed with false claims. As reported in an article in Fortune Magazine by Stephen Gandel, on December 22, 2014, titled "The Fund that was Too Good to be True," (the "Fortune Article") Present began claiming, in January 2009 that AlphaSector's performance was in the 99th percentile of large capitalization mutual funds. In Early 2010, F-Squared claimed that the AlphaSector Premium index had returned 198% since 2001 vs 13.5% for the S&P 500. Present even claimed that F-Squared had avoided

losses in 2001 by dropping the technology sector, despite the fact that F-Squared did not exist in 2001 and did not begin managing client assets until February of 2009.

51.     In the fall of 2009, Virtus began offering its first mutual funds with the AlphaSector Strategy: the Virtus AlphaSector Allocation Fund; and the Virtus AlphaSector Rotation Fund. Together, the two funds raised approximately $170 million in 2009, the first year they were marketed. As a result of these initial successes, Virtus launched three new funds based on the AlphaSector Strategy and sub-advised by F-Squared, launching the Virtus Premium AlphaSector Fund on July 12, 2010 and the Virtus Allocator Premium AlphaSector Fund and Virtus Global Premium AlphaSector Fund on March 15, 2011.

52.     Due to the strategy's supposedly top-flight track record, Virtus was able to demand extremely high fees for their funds. According to a Jefferies October 9, 2013 analyst report, Virtus charged annual fees of 1.50% of assets under management on the Virtus Dynamic AlphaSector fund were the highest in the industry, 300% higher than the average fees across all product lines.

53.     As set forth in the Consolidated Amended Complaint filed in *In re Virtus Investment Partners, Inc. Securities Litigation* 15-cv-1249 (SDNY 2015) (the "Virtus Stockholder Complaint")[1], according to a former Virtus wholesaler who was employed by Virtus during the Class Period and who was involved in marketing AlphaSector Funds, the track record of the AlphaSector Funds was the crucial selling point of the funds, and "everything was built on the track record."

---

[1] In the course of investigating this action, Plaintiffs' counsel reviewed the Virtus Stockholder Complaint, and confirmed, to the extent possible, that the information in that complaint was correct and conformed with other sources of information including news articles and documents filed by the SEC. Plaintiffs' counsel in this action contacted Plaintiffs' counsel in *In re Virtus Investment Partners, Inc. Securities Litigation* to request that Plaintiffs in that action confirm the steps taken to conduct an investigation. Plaintiffs' Counsel in *In re Virtus Investment Partners, Inc. Securities Litigation* declined to discuss the matter.

Wholesalers were "instructed to show what the funds did in 2001 to 2008" and emphasize that they "dramatically outperformed the S&P 500."

54.     It was widely known within Virtus that the AlphaSector "historic" results were fabricated. According to the Fortune Article, Present became known within Virtus as "Howie Backtest", with a former employee quoted in the Fortune Article stating that "[h]e would come with us on sales calls and tell people to go to a website that showed he had the best-performing fund in the U.S."

55.     The mutual fund trade publication RIABiz revealed that Present's backtesting was widely known within Virtus at least since December 14, 2012. In an article dated February 9, 2015 by Sanders Wommack, titled "Where Virtus Stands after F-Squared Seemingly Led it Astray, to Mutual Benefit", (the "RIABiz" article), it was reported that a conference was held for Virtus wholesalers at the Boca Raton Florida Beach Resort and Club on December 14, 2012. On the first day, Present gave a presentation that "included the language, 'The AlphaSector Premium Index is based on an active strategy with an inception date of April 1, 2001. Inception date is defined as the date as of which investor assets began tracking the strategy.'" Defendant Waltman, as well as executive vice president Jeff Cerutti, were in attendance at this presentation. After the presentation was completed, Peter Batchelar, Virtus' head of product management, "told the wholesalers not to heed the portion of Present's remarks relating to F-Squared's allegedly 'live' track record. F-Squared's incredible returns were, he said, based not on actual client assets but on the backtesting of hypothetical assets." According to the Virtus Stockholder Complaint, a former wholesaler for Virtus who was in attendance revealed Aylward attended the meeting via telephone and therefore heard Batchelar say that Virtus' results were based on backtesting, not on actual trading with real client's assets. The former Virtus wholesaler stated that in addition to Batchelar, senior managers and John McCormick and Paul Cahill also contradicted Present's statements at the conference.

56.     .

57.     According to the Fortune Magazine Article, the SEC began investigating F-Squared by late 2013. The same Virtus wholesaler mentioned in the prior paragraph stated that he was aware of a meeting between senior Virtus advisors and Howard Present in late September or early October of 2013. The wholesaler did not attend but heard from persons who did that Cerutti, Cahill, and McCormack were in attendance, and that during the meeting Present revealed that the SEC was investigating F-Squared regarding AlphaSector's performance from 2001 to 2008. Shortly after the meeting, Virtus management organized a conference call including Alyward, Cerutti, Batchelar, Cahill, and McCormick. The former employee personally attended this call. Virtus' employees were told on this call that they "had to do a scorched earth" and destroy "any materials they had" relating to AlphaSector's track record. This employee stated that he and others destroyed hard copy documents as well as emails because "everything needed to be gone." According to this employee, Virtus employees were told that this was an "F-Squared issue, not a Virtus issue." However, the sales force was in a panic, and wholesalers had weekly sales meetings almost every Friday for a year where the "SEC investigation became the number one point of conversation." Cerutti, Batchelar and others were on these Friday calls attempting to reassure wholesalers by noting that any problems would stop at the corporate level.

## V.     The Operation of the AlphaSector Funds

58.     The AlphaSector mutual fund shares were issued by VOT, an SEC-registered investment company and Trust. VOT operates from the same office as Virtus; its President and Trustee is defendant Aylward and it is controlled by Virtus. Virtus' name also appears on registration statements for funds issued by VOT.

59.     The investment adviser for the Virtus AlphaSector Funds was VIA, a subsidiary that was 100%-owned by Virtus. Virtus and VIA shared the Individual

Defendants, who were the senior officers of both companies. VIA is also controlled by Virtus.

60.     AlphaSector Funds' registration statements and prospectuses identify VIA as the investment adviser, and also identify F-Squared as a sub-adviser to the funds. F-Squared was the apparent creator and manager of the AlphaSector strategy employed by the Virtus funds.

## VI.     False and Misleading Statements and Material Omissions

61.     VOT's Certified Shareholder Report for the period ending September 30, 2009[2] stated that the Board "had managed investments using its proprietary strategy since 2001 and … the historical investment returns of the Index as published by the Subadviser, which not only outperformed the broad market indexes, like the S&P 500(R) Index, but provided a positive return at certain times when the market indexes provided negative returns."

62.     On January 28, 2010, VOT filed a post-effective amendment to its registration statement on form 485BPOS ("2010 Registration Statement"). The 2010 Registration Statement was signed by Aylward, Bradley, Keith, McLoughlin, McNamara, Oates, Segerson, and Verdonck. The 2010 Registration Statement represented that the AlphaSector Rotation Index had earned the following total historic returns:

| | AlphaSector Rotation Index | S&P 500 Index |
|---|---|---|
| **Annual Returns (calendar year)** | | |
| 2002 | -8.18% | -22.10% |
| 2003 | 9.38% | 28.68% |
| 2004 | 13.89% | 10.88% |
| 2005 | 5.65% | 4.91% |
| 2006 | 14.40% | 15.79% |

[2] All filings with the Securities and Exchange Commission referenced herein are incorporated by reference as if fully set forth herein.

| | | |
|---|---:|---:|
| 2007 | 14.18% | 5.49% |
| 2008 | -8.54% | -37.00% |
| 2009 | 25.37% | 26.46% |

| | 1 Year | 5 Years | Since Inception of AlphaSector Rotation Index (4/1/01)[1] |
|---|---|---|---|
| **Average Annual Total Return (for the periods ended 12/31/09)** | | | |
| AlphaSector Rotation Index | 25.37% | 9.61% | 7.11% |
| S&P 500 Index | 26.46% | 0.42% | 13.46% |

[1] The Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 1,000.00 on October 13, 2008.

63.    On January 27, 2011, VOT filed a post-effective amendment to its registration statement on form 485BPOS ("2011 Registration Statement"). The 2010 Registration Statement was signed by Aylward, Bradley, Keith, McLoughlin, McNamara, Oates, Segerson, and Verdonck. The 2011 Registration Statement represented that the AlphaSector Rotation Index had earned the following total historic returns:

| | AlphaSector Rotation Index | S&P 500 Index |
|---|---:|---:|
| **Annual Returns (calendar year)** | | |
| 2002 | -8.18% | -22.10% |
| 2003 | 9.38% | 28.68% |
| 2004 | 13.89% | 10.88% |
| 2005 | 5.65% | 4.91% |
| 2006 | 14.40% | 15.79% |
| 2007 | 14.18% | 5.49% |
| 2008 | -8.54% | -37.00% |
| 2009 | 25.37% | 26.46% |

| | | | Since Inception of AlphaSector Rotation Index (4/1/01)[1] |
|---|---|---|---|
| 2010 | | 15.50% | 15.06% |

| Average Annual Total Return (for the periods ended 12/31/10) | 1 Year | 5 Years | Since Inception of AlphaSector Rotation Index (4/1/01)[1] |
|---|---|---|---|
| AlphaSector Rotation Index | 15.50% | 11.58% | 7.94% |
| S&P 500 Index | 15.06% | 2.29% | 2.77% |

[1] The Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 1,000.00 on October 13, 2008.

64.     On January 27, 2012, VOT filed a post-effective amendment to its registration statement on form 485BPOS ("2012 Registration Statement"). The 2010 Registration Statement was signed by Aylward, Bradley, Keith, McLoughlin, McNamara, Oates, Segerson, and Verdonck. The 2012 Registration Statement represented that the AlphaSector Rotation Index had earned the following total historic returns:

| | AlphaSector Rotation Index | S&P 500 Index |
|---|---|---|
| **Annual Returns (calendar year)** | | |
| 2002 | -8.18% | -22.10% |
| 2003 | 9.38% | 28.71% |
| 2004 | 13.89% | 10.86% |
| 2005 | 5.65% | 4.93% |
| 2006 | 14.40% | 15.78% |
| 2007 | 14.18% | 5.49% |
| 2008 | -8.54% | -37.00% |
| 2009 | 25.37% | 26.46% |
| 2010 | 15.50% | 15.06% |

2011                                                                    1.35%        2.11%

| | 1 Year | 5 Years | 10 Years | Since Inception of AlphaSector Rotation Index (4/1/01)[1] |
|---|---|---|---|---|
| **Average Annual Total Return (for the periods ended 12/31/11)** | | | | |
| AlphaSector Rotation Index | 1.35% | 8.91% | 7.80% | 7.31% |
| S&P 500 Index | 2.11% | -0.25% | 2.92% | 2.71% |

[1] The Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 1,000.00 on October 13, 2008.

65.    The 2012 Registration Statement made the following statement that the Premium AlphaSector index had earned the following annual investment returns:

| | Premium AlphaSector Index | S&P 500 Index |
|---|---|---|
| **Annual Returns (calendar year)** | | |
| 2002 | 5.04% | -22.10% |
| 2003 | 24.07% | 28.71% |
| 2004 | 14.90% | 10.86% |
| 2005 | 6.83% | 4.93% |
| 2006 | 16.81% | 15.78% |
| 2007 | 14.86% | 5.49% |
| 2008 | -1.13% | -37.00% |
| 2009 | 32.22% | 26.46% |
| 2010 | 17.66% | 15.06% |
| 2011 | 1.68% | 2.11% |

| | 1 Year | 5 Years | 10 Years | Since Inception of Premium AlphaSector Index (4/1/01)[1] |
|---|---|---|---|---|
| **Average Annual Total Return (for the periods ended 12/31/11)** | | | | |
| Premium AlphaSector Index | 1.68% | 12.43% | 12.87% | 12.56% |
| S&P 500 Index | 2.11% | -0.25% | 2.92% | 2.71% |

[1] The Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 100.00 on January 3, 2011.

66.    On January 25, 2013, VOT filed a post-effective amendment to its registration statement on form 485BPOS ("2013 Registration Statement"). The 2010 Registration Statement was signed by Aylward, Bradley, Keith, McLoughlin, McNamara, Oates, Segerson, and Verdonck. The 2013 Registration Statement represented that the AlphaSector Rotation Index had earned the following total investment returns:

| | AlphaSector Rotation Index | S&P 500 Index |
|---|---|---|
| **Annual Returns (calendar year)** | | |
| 2003 | 9.38% | 28.71% |
| 2004 | 13.89% | 10.86% |
| 2005 | 5.65% | 4.93% |
| 2006 | 14.40% | 15.78% |
| 2007 | 14.18% | 5.49% |
| 2008 | -8.54% | -37.00% |
| 2009 | 25.37% | 26.46% |
| 2010 | 15.50% | 15.06% |
| 2011 | 1.35% | 2.11% |
| 2012 | 14.47% | 16.00% |

| | 1 Year | 5 Years | 10 Years | Since Inception of AlphaSector Rotation Index (4/1/01)[1] |
|---|---|---|---|---|
| **Average Annual Total Return (for the periods ended 12/31/12)** | | | | |
| AlphaSector Rotation Index | 14.47% | 8.97% | 10.20% | 7.90% |
| S&P 500 Index | 16.00% | 1.66% | 7.10% | 3.78% |

[1] The Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 1,000.00 on October 13, 2008.

67.     The 2012 Registration Statement included the following statement that the Premium AlphaSector index had earned the following annual investment returns:

| | Premium AlphaSector Index | S&P 500 Index |
|---|---|---|
| **Annual Returns (calendar year)** | | |
| 2003 | 24.07% | 28.71% |
| 2004 | 14.90% | 10.86% |
| 2005 | 6.83% | 4.93% |
| 2006 | 16.81% | 15.78% |
| 2007 | 14.86% | 5.49% |
| 2008 | -1.13% | -37.00% |
| 2009 | 32.22% | 26.46% |
| 2010 | 17.66% | 15.06% |
| 2011 | 1.68% | 2.11% |
| 2012 | 13.90% | 16.00% |

FIRST AMENDED COMPLAINT

| | 1 Year | 5 Years | 10 Years | Since Inception of Premium AlphaSector Index (4/1/01)[1] |
|---|---|---|---|---|
| **Average Annual Total Return (for the periods ended 12/31/12)** | | | | |
| Premium AlphaSector Index | 13.90% | 12.24% | 13.79% | 12.65% |
| S&P 500 Index | 16.00% | 1.66% | 7.10% | 3.78% |

[1] The Index inception date is April 1, 2001; it commenced daily calculation and dissemination by NASDAQ OMX with a base value 100.00 on January 3, 2011.

68.     The foregoing statements of historical investment performance were misleading for failing to disclose that the AlphaSector Rotation Index and the Premium AlphaSector Index were not developed until October of 2008, that the AlphaSector Strategy was not used to manage real assets prior to October 2008, and that the represented results prior to October 2008 were back-tested. Moreover, the true backtested results obtained were actually far worse than the results represented in the registration statements because of a known error in the calculation.

69.     In short, Defendants lied twice to investors. First, misrepresenting that the investment returns were much higher than was true. And Second, Defendants misrepresented that the investment returns were earned in the actual trading of assets under management for client assets, when in fact, the results were obtained through "backtesting" or estimating investment returns for hypothetical trading of hypothetical assets.

70.     VOT issued a registration statement on January 28, 2014, signed by Aylward, Bradley, Keith, McLoughlin, McNamara, Oates, Segerson, and

FIRST AMENDED COMPLAINT

Verdonck, and while it did not include the bogus investment return figures stated above, it did not retract or restate those prior misrepresentations, which was misleading for failing to disclose that F-Squared had provided fabricated data to support its claims.  It failed to disclose that F-Squared was under investigation by the SEC, and that Virtus had destroyed documents related to the AlphaSector index.  It also failed to disclose that the basis for which F-Squared was hired in the first place – the historic track record of the AlphaSector Funds, was based on a lie.

## VII.   The Truth Emerges

71.     On September 5, 2014, the *Wall Street Journal*, in an article entitled "F-Squared Investment Receives Wells Notice From SEC, and Brokers Back Away," first reported that F- Squared had received a Wells Notice[3] from the SEC for alleged falsifications about its performance and track record in its sales and marketing materials and required regulatory filings. *The Wall Street Journal* also reported that two brokerage firms, RBC Wealth Management and Raymond James, had set limits on how much new business its advisers can conduct with F- Squared, and that Wells Fargo Advisors had put the firm on "watch," essentially a caution to investment advisers about its products.     This news report did not directly mention Virtus, or link F- Squared's fraud to Virtus's financial performance, so, at best, only a partial truth was revealed.

72.     Subsequently, on November 14, 2014, Howard Present, F-Squared's President resigned.

73.     On December 22, 2014, the SEC announced that it had formally settled charges against F-Squared for securities fraud and various violations of the IAA, and the ICA of 1940, and had charged its President, Howard Present, with

---

[3]   A Wells Notice is a notice that the SEC intends to initiate an enforcement action for violation of the federal securities laws and provides the target defendant(s) an opportunity to convince the SEC that an enforcement action is not warranted.

violations of the securities laws. F-Squared acknowledged multiple violations, agreed to $35 million in fines and penalties and the imposition of a compliance monitor.

74.     That same date, the SEC released the SEC Order. That order included an "Appendix A" where F-Squared admitted the following facts:

a.     "F-Squared and Present began advertising the AlphaSector strategy via an index in September 2008. From inception, F-Squared stated in advertisements that AlphaSector is an ETF sector rotation strategy that (i) invests in as many as nine U.S. equities industry ETFs, with an algorithm or quantitative engine determining whether, based on ETF sector trends and volatility, the portfolio would invest in none, some, or all of the nine ETFs; (ii) holds equal ownership of any of the nine ETFs with a positive trend and no ownership of any of the nine ETFs with a negative or neutral trend; (iii) rebalances periodically, either weekly or monthly, and only when at least one of the nine ETFs show a change in trend; and (iv) applies a 25% cap per ETF (i.e., no ETF would hold more than 25% of the total assets in the strategy) at the time of rebalancing, with the remainder of the portfolio invested in a short-term treasury ETF (representing cash)."

b.     "Present created and was responsible for all of F-Squared's AlphaSector advertisements, which included PowerPoint presentations describing the strategy and its past performance, including for the period April 2001 to September 2008. The relevant slides from F-Squared's August 2013 standard presentation for the AlphaSector Premium Index, which was available on F-Squared's public website until the end of September 2013, are attached as Exhibit 1. F-Squared posted the presentations and other AlphaSector performance advertisements and marketing materials on its public website and sent them to numerous prospective and current clients from September 2008 to September 2013."

c.      "From AlphaSector's inception in October 2008 through September 2013, F-Squared advertised AlphaSector's past performance as index performance. Even though F-Squared did not create AlphaSector until late 2008, F-Squared made two materially false claims in its AlphaSector advertisements and Forms ADV, namely that:

"• the in/out ETF signals that formed the basis of the AlphaSector index returns had been used to manage client assets from April 2001 to September 2008; and

"• the in/out ETF signals resulted in a track record that significantly outperformed the S&P 500 Index from April 2001 to September 2008.

"F-Squared was at least reckless in advertising both of these statements."

d.      "According to Present, in early 2008, Present and a proprietor of a private wealth advisory firm (hereinafter, 'Private Wealth Advisor') [Morton] discussed a sector rotation investment strategy using ETFs. According to Present, in the context of these discussions, the Private Wealth Advisor claimed to have used a sector rotation strategy to manage client assets. Present never saw records showing that the Private Wealth Advisor had invested advisory clients in a sector rotation strategy."

e.      "Present also understood that the Private Wealth Advisor had a college intern who was developing an algorithm to use in conjunction with the sector rotation strategy. The algorithm could generate a momentum-based signal that could be used to determine whether to invest or not invest in a particular sector ETF. As discussions between Present and the Private Wealth Advisor moved forward in summer 2008, the Private Wealth Advisor decided to co-found a signal provider company (the 'Data Provider') with his intern. The Data Provider would send data with in/out signals to F-Squared that F-Squared would then use to

determine whether AlphaSector would own or not own an ETF."

f.     "In late August and early September 2008, as F-Squared and the Data Provider were finalizing a contract for signal delivery [i.e. buy and sell recommendations based on the AlphaSector Strategy] to F-Squared, the Private Wealth Advisor's intern sent Present three sets of hypothetical, back-tested weekly trends for each of the ETFs. A positive trend was a signal to be 'in' (buy or own) the ETF, and a negative trend was a signal to be 'out' (sell or do not own) of the ETF. The first two data sets of trends were based on whether the simple moving average of each ETF had increased or decreased from the previous week. One of the two sets of trends was based on a 41-week simple moving average and the other set was based on a 61-week simple moving average. The intern's third set of signals were from his own algorithm."

g.     "F-Squared created the pre-October 2008 "historical track record" incorrectly by implementing all the purchases and sales dictated by the ETF trend signals one week before they should have been implemented. Because the signals were detecting price momentum, F-Squared's incorrectly implementing the signals one week early meant that AlphaSector's "historical track record" was based on its selling before price drops that had already occurred and buying before price increases that had already occurred. As described below, virtually all of AlphaSector's claimed outperformance relative to the S&P 500 Index for the pre-October 2008 period is attributable to this erroneous calculation."

h.     "The inaccurate compilation of historical data substantially improved the AlphaSector's strategy's advertised back-tested and hypothetical historical performance for the pre-October 2008 period. If an investor made a hypothetical investment of $100,000 on April 1, 2001 (assuming a reinvestment of dividends and no further contributions or withdrawals), the investment would have been worth approximately $128,000 on August 24, 2008 if invested in the S&P 500 Index. With accurately timed (but still hypothetical and back-tested) signal

hold

implementation, the same investment in F-Squared's hypothetical ETF sector rotation strategy would have been worth $138,000. However, by implementing the hypothetical and back-tested signals one week early, F-Squared advertised the investment as worth $235,000."

i.   "On multiple occasions after September 2008, Present requested back-up documentation from the Private Wealth Advisor to support AlphaSector's track record. Present never received back-up from the Private Wealth Advisor. Despite the lack of documentation of live assets supporting AlphaSector's performance for the period prior to September 2008, F-Squared and Present continued to advertise the false track record until September 2013."

j.   "In January 2009, Present contacted the Private Wealth Advisor and his business partner to obtain an audited track record for the Private Wealth Advisor's accounts that had supposedly tracked the AlphaSector methodology. Present did not receive one. During these discussions, the Private Wealth Advisor told Present that the Private Wealth Advisor did not have a specific track record because he considered the sector rotation strategy to be a client-by-client trading strategy and not a specific product."

k.   "In June 2012, F-Squared retained an outside attorney to perform a mock audit. One of the recommendations from the mock audit was that F-Squared "should ensure that it has books and records to support its performance disclosed for years prior to the year 2006." Present sent several communications in June and July 2012 to the Private Wealth Advisor and officers of the Data Provider co-founded by the Private Wealth Advisor in 2008, seeking the required records. F-Squared's then-CCO [Chief Compliance Officer] also prepared a document by which the Data Provider and/or the Private Wealth Advisor would certify that they had records to support the advertised historical performance. These efforts proved unsuccessful. Present's effort to elicit information from the Data Provider also prompted the Data Provider's CEO and COO to tell Present that: (i) the Private

Wealth Advisor's former intern (now the Chief Technology Officer (CTO) of the Data Provider) was only 14 years old in 2001; and (ii) the data the former intern sent Present would have been back-tested for the period before either 2007 or 2008, when the former intern started working on the algorithm."

l.      "In October 2012, Present received a copy of a September 2008 email from a then F-Squared employee to a then employee of the Private Wealth Advisor concerning the implementation of historical signals. That email concerned the dating convention associated with the Data Provider's signals and should have called into question whether F-Squared implemented the signals one week early in creating AlphaSector's pre-October 2008 track record. Nonetheless, Present and F-Squared continued to advertise that inflated track record."

m.      "During the October 2008 to October 2013 time period, F-Squared failed to adopt and implement policies reasonably designed to prevent violations of the Advisers Act and its rules. For example, F-Squared did not have policies reasonably designed to prevent the use of performance advertising materials that were false or misleading. Furthermore, F-Squared published performance advertisements without back-up for the performance, even after the issue was identified in a mock audit in 2012."

75.      Also on December 22, 2014, the SEC filed the SEC Present Complaint containing substantially the same allegations as set forth in the foregoing paragraphs. The Complaint against Present also stated that Newfound[4] reminded Present on June 18, 2012 that the intern who developed the AlphaSector strategy was then 24 years old and therefore would have been 14 in 2001, and had not developed the AlphaSector strategy at that time. Therefore any data provided prior to the development of the model in 2007/2008 was back-tested.

---

[4] The SEC's Complaint against Present only refers to an anonymous "Data Provider" but based upon information provided in that Complaint, it appears that the reference is to Newfound.

**VIII.  Obligations of the Board of Trustees of the Virtus Opportunities Trust**

76.     Virtus Opportunities Trust is, and was throughout the Class Period, a registered Investment Company under the Investment Company Act of 1940.

77.     Pursuant to Section 15 of the Investment Company Act, the Trustees of the Virtus Opportunities Trust were required to approve annually the retention or renewal of any sub-adviser for VOT, including F-Squared. Section 15 also required that the Trustees request and evaluate such information that is reasonably necessary to evaluate the terms of any contract with F-Squared. F-Squared was evaluated and re-approved each year of the Class Period. According to a Virtus employee in the Performance Operations Group, and reported to Defendant Waltman, as set forth in the Virtus Stockholder Complaint, Virtus used an array of methods to conduct due diligence, which included the "recalculation or reengineering of data" – meaning that the Board of Virtus would re-review data relied on by F-Squared to determine that their conclusions based on those data were sound. Waltman and Batchelar were responsible for conducting the initial due diligence of the AlphaSector Strategy.

78.     In initially approving the Virtus AlphaSector Allocation Fund and the Virtus AlphaSector Rotation Fund, as explained in VOT's Certified Shareholder Report for the period ending September 30, 2009:

a.     "[T]he board is responsible for determining whether to approve the entering into and continuation of each investment advisory and subadvisory agreement for the Trust…. At a meeting held on June 3-4, 2009, the Board, including a majority of the Trustees who are not interested persons as defined in Section 2(a)(19) of the Investment Company Act of 1940, considered and approved …. a subadvisory agreement with F-Squared Investments, Inc. ('F-Squared' or the 'Subadviser') for each Fund (the 'Subadvisory Agreement')…."

b.     "In reaching their decisions, the Board requested and evaluated information provided by … F-Squared which, in the Board's view constituted

information necessary for the Board to form a judgment as to whether approval of the … Subadvisory Agreement was in the best interests of the Funds and their shareholders. …."

        c.    "In recommending that shareholders approve the proposal, the Trustees considered various factors, including:

        d.    "the nature, extent and quality of the services to be provided by the Subadviser. …. The Trustees noted that the Subadviser had managed investments using its proprietary strategy since 2001…;" [and]

        e.    "the historical investment returns of the Index as published by the Subadviser, which not only outperformed the broad market indexes, like the S&P 500(R) Index, but provided a positive return at certain times when the market indexes provided negative returns…."

    79.    In 2010, with respect to the AlphaSector Allocation Fund and the AlphaSector Rotation Fund, VOT's Certified Shareholder Report for the period ending March 31, 2010 stated that the board had determined based upon, in part, information provided by F-Squared, that continued retention of F-Squared was in the best interests of investors. The Board specifically stated that they considered F-Squared's "investment management process, including … the experience, capability and integrity of" F-Squared's management and the "quality and commitment of" F-Squared's "regulatory and legal compliance policies, procedures and systems." The Board made substantially identical representations on an annual basis throughout the Class Period, most recently in March of 2014.

## IX.    Additional Allegations Supporting Scienter

### A.    Additional Allegations Supporting Scienter of Aylward

    80.    In his role as a member of the board of VOT, Aylward was charged with conducting due diligence in determining whether to retain F-Squared as a sub-advisor. VOT's annual statements make clear that the Board received documentation directly from F-Squared. Moreover, the Board's decision to retain

F-Squared as sub-advisor for various mutual funds was based on the Board's assessment of the performance of the AlphaSector Indices. However, as revealed in F-Squared's mock audit, F-Squared did not in fact have any documentation supporting the claimed investment returns for the AlphaSector Indicies for the years 2001 to 2008.

81.    Other red flags existed which indicated that the AlphaSector Indices' investment results from the years 2001 to 2008 were false, including the facts that

a.    Neither F-Squared nor Newfound Research existed until 2006 and 2008 respectively;

b.    Hoffstein was 14 years old when the AlphaSector Index was supposedly developed in 2001.

82.    Scienter can further be inferred from the fact that Batchelar announced, at a conference attended by numerous people, that F-Squared's results were back-tested, a fact of which Aylward would have been aware because he attended the conference via phone.

83.    Aylward's scienter can also be inferred from the Board's decision to remove all references to the pre-2008 historic results of the AlphaSector Indicies from the 2014 Registration Statement, without disclosing to investors that the results were back-tested and therefore false.

**B.    Additional Allegations Supporting Scienter of Bradley**

84.    In his role chief financial officer and treasurer of VOT, Bradley was charged with confirming financial information in the registration statements, including the statements regarding the performance of the AlphaSector Indices. However, as revealed in F-Squared's mock audit, F-Squared did not in fact have documentation supporting the claims results for the AlphaSector Indicies for the years 2001 to 2008.

85.    Other red flags existed which indicated that the AlphaSector Indices' results from the years 2001 to 2008 were false and back-tested, including the facts

that

      a.     Neither F-Squared nor Newfound Research existed until 2006 and 2008 respectively;

      b.     Hoffstein was 14 years old when the AlphaSector Index was supposedly developed in 2001.

86.    Scienter can further be inferred from the fact that Batchelar announced, at a conference attended by numerous people, that F-Squared's results were back-tested, a fact of which Bradley would have been aware.

87.    Bradley's scienter can also be inferred from the Board's decision to remove all references to the AlphaSector Indices pre-2008 results from the 2014 Registration Statement, without disclosing to investors that the results were back-tested.

### C.    Additional Allegations Supporting Scienter of Keith

88.    In his role as a member of the board of VOT, Keith was charged with conducting due diligence in determining whether to retain F-Squared as a sub-advisor. VOT's annual statements make clear that the Board received documentation directly from F-Squared. Moreover, the Board's decision to retain F-Squared as sub-advisor for various mutual funds was based on the Board's assessment of the performance of the AlphaSector Indicies. However, as revealed in F-Squared's mock audit, F-Squared did not in fact have documentation supporting the claims results for the AlphaSector Indicies for the years 2001 to 2008.

89.    Other red flags existed which indicated that the AlphaSector Indices' results from the years 2001 to 2008 were back-tested, including the facts that

      a.     Neither F-Squared nor Newfound Research existed until 2006 and 2008 respectively;

      b.     Hoffstein was 14 years old when the AlphaSector Index was supposedly developed in 2001.

FIRST AMENDED COMPLAINT

90.     Scienter can further be inferred from the fact that Batchelar announced, at a conference attended by numerous people, that F-Squared's results were back-tested, a fact of which Keith would have been aware.

91.     Keith's scienter can also be inferred from the Board's decision to remove all references to the AlphaSector Indices pre-2008 results from the 2014 Registration Statement, without disclosing to investors that the results were back-tested.

**D.     Additional Allegations Supporting Scienter of McLoughlin**

92.     In his role as a member of the board of VOT, McLoughlin was charged with conducting due diligence in determining whether to retain F-Squared as a sub-advisor. VOT's annual statements make clear that the Board received documentation directly from F-Squared. Moreover, the Board's decision to retain F-Squared as sub-advisor for various mutual funds was based on the Board's assessment of the performance of the AlphaSector Indices. However, as revealed in F-Squared's mock audit, F-Squared did not in fact have documentation supporting the claims results for the AlphaSector Indicies for the years 2001 to 2008.

93.     Other red flags existed which indicated that the AlphaSector Indices' results from the years 2001 to 2008 were back-tested, including the facts that

a.     Neither F-Squared nor Newfound Research existed until 2006 and 2008 respectively;

b.     Hoffstein was 14 years old when the AlphaSector Index was supposedly developed in 2001.

94.     Scienter can further be inferred from the fact that Batchelar announced, at a conference attended by numerous people, that F-Squared's results were back-tested, a fact of which McLoughlin would have been aware.

95.     McLoughlin's scienter can also be inferred from the Board's decision to remove all references to the AlphaSector Indices pre-2008 results from the 2014

**FIRST AMENDED COMPLAINT**

Registration Statement, without disclosing to investors that the results were back-tested.

### E.   Additional Allegations Supporting Scienter of McNamara

96.   In his role as a member of the board of VOT, McNamara was charged with conducting due diligence in determining whether to retain F-Squared as a sub-advisor. VOT's annual statements make clear that the Board received documentation directly from F-Squared. Moreover, the Board's decision to retain F-Squared as sub-advisor for various mutual funds was based on the Board's assessment of the performance of the AlphaSector Indices. However, as revealed in F-Squared's mock audit, F-Squared did not in fact have documentation supporting the claims results for the AlphaSector Indicies for the years 2001 to 2008.

97.   Other red flags existed which indicated that the AlphaSector Indices' results from the years 2001 to 2008 were back-tested, including the facts that

a.   Neither F-Squared nor Newfound Research existed until 2006 and 2008 respectively;

b.   Hoffstein was 14 years old when the AlphaSector Index was supposedly developed in 2001.

98.   Scienter can further be inferred from the fact that Batchelar announced, at a conference attended by numerous people, that F-Squared's results were back-tested, a fact of which McNamara would have been aware.

99.   McNamara's scienter can also be inferred from the Board's decision to remove all references to the AlphaSector Indices pre-2008 results from the 2014 Registration Statement, without disclosing to investors that the results were back-tested.

### F.   Additional Allegations Supporting Scienter of Oates

100.   In his role as a member of the board of VOT, Oates was charged with conducting due diligence in determining whether to retain F-Squared as a sub-

advisor. VOT's annual statements make clear that the Board received documentation directly from F-Squared. Moreover, the Board's decision to retain F-Squared as sub-advisor for various mutual funds was based on the Board's assessment of the performance of the AlphaSector Indices. However, as revealed in F-Squared's mock audit, F-Squared did not in fact have documentation supporting the claims results for the AlphaSector Indicies for the years 2001 to 2008.

101.   Other red flags existed which indicated that the AlphaSector Indices' results from the years 2001 to 2008 were back-tested, including the facts that

a.   Neither F-Squared nor Newfound Research existed until 2006 and 2008 respectively;

b.   Hoffstein was 14 years old when the AlphaSector Index was supposedly developed in 2001.

102.   Scienter can further be inferred from the fact that Batchelar announced, at a conference attended by numerous people, that F-Squared's results were back-tested, a fact of which Oates would have been aware.

103.   Oates' scienter can also be inferred from the Board's decision to remove all references to the AlphaSector Indices pre-2008 results from the 2014 Registration Statement, without disclosing to investors that the results were back-tested.

## G.   Additional Allegations Supporting Scienter of Segerson

104.   In his role as a member of the board of VOT, Segerson was charged with conducting due diligence in determining whether to retain F-Squared as a sub-advisor. VOT's annual statements make clear that the Board received documentation directly from F-Squared. Moreover, the Board's decision to retain F-Squared as sub-advisor for various mutual funds was based on the Board's assessment of the performance of the AlphaSector Indices. However, as revealed in F-Squared's mock audit, F-Squared did not in fact have documentation

supporting the claims results for the AlphaSector Indicies for the years 2001 to 2008.

105.  Other red flags existed which indicated that the AlphaSector Indices' results from the years 2001 to 2008 were back-tested, including the facts that

a.  Neither F-Squared nor Newfound Research existed until 2006 and 2008 respectively;

b.  Hoffstein was 14 years old when the AlphaSector Index was supposedly developed in 2001.

106.  Scienter can further be inferred from the fact that Batchelar announced, at a conference attended by numerous people, that F-Squared's results were back-tested, a fact of which Segerson would have been aware.

107.  Segerson's scienter can also be inferred from the Board's decision to remove all references to the AlphaSector Indices pre-2008 results from the 2014 Registration Statement, without disclosing to investors that the results were back-tested.

## H.   Additional Allegations Supporting Scienter of Verdonck

108.  In his role as a member of the board of VOT, Verdonck was charged with conducting due diligence in determining whether to retain F-Squared as a sub-advisor. VOT's annual statements make clear that the Board received documentation directly from F-Squared. Moreover, the Board's decision to retain F-Squared as sub-advisor for various mutual funds was based on the Board's assessment of the performance of the AlphaSector Indices. However, as revealed in F-Squared's mock audit, F-Squared did not in fact have documentation supporting the claims results for the AlphaSector Indicies for the years 2001 to 2008.

109.  Other red flags existed which indicated that the AlphaSector Indices' results from the years 2001 to 2008 were back-tested, including the facts that

a.  Neither F-Squared nor Newfound Research existed until 2006

FIRST AMENDED COMPLAINT

and 2008 respectively;

        b.    Hoffstein was 14 years old when the AlphaSector Index was supposedly developed in 2001.

110.    Scienter can further be inferred from the fact that Batchelar announced, at a conference attended by numerous people, that F-Squared's results were back-tested, a fact of which Verdonck would have been aware.

111.    Verdonck's scienter can also be inferred from the Board's decision to remove all references to the AlphaSector Indices pre-2008 results from the 2014 Registration Statement, without disclosing to investors that the results were back-tested.

## X.    Loss Causation

112.    The misrepresentation of the AlphaSector Funds' track records caused investors to purchase and to not sell their investments in the AlphaSector Funds. During the period where the results of the AlphaSector Indices were backtested, the Indices purportedly beat the S&P 500 by a significant margin. For 2002 to 2008, the AlphaSector Rotation index showed an average annual return of 5.82%. The Premium AlphaSector index showed an average annual return of 11.63%. The S&P 500 showed an average annual return of .95. Even more impressively, while the S&P 500 lost 37% in 2008, the AlphaSector Rotation index only lost 8.54%, and the AlphaSector premium index lost only 1.13%. These results, which demonstrated that the AlphaSector strategy could outperform the S&P 500 in general and particularly at times of economic crisis, caused Plaintiffs to invest in, and remain invested in, the mutual funds.

113.    The result of these misrepresentations was to cause Plaintiffs to invest in funds that significantly underperformed the S&P 500. Each fund managed by F-Squared underperformed the S&P 500 for the time that it was in existence. Below is a chart showing the performance of the AlphaSector Funds' Performance since inception, followed in each case by a comparison with the performance of the S&P

500 Total Return Index (which takes dividends into account, unlike the S&P 500 price index).

| Fund | 2010 | 2011 | 2012 | 2013 | 2014 | Average |
|---|---|---|---|---|---|---|
| S&P 500 Total Return | 15.06 | 2.11 | 16 | 32.39 | 13.69 | 15.85 |
| | | | | | | |
| VAAAX | — | — | 8.76 | 11.9 | -1.31 | 6.45 |
| VS S&P | | | -7.24 | -20.49 | -15 | -14.24 |
| VAACX | — | — | 7.99 | 11.01 | -2.02 | 5.66 |
| VS S&P | | | -8.01 | -21.38 | -15.71 | -15.03 |
| VAISX | — | — | 8.97 | 12.12 | -1.08 | 6.67 |
| VS S&P | | | -7.03 | -20.27 | -14.77 | -14.02 |
| PWBAX | 13.85 | 1.58 | 12.01 | 31.84 | 8.15 | 13.486 |
| VS S&P | -1.21 | -0.53 | -3.99 | -0.55 | -5.54 | -2.364 |
| PWBCX | 12.9 | 0.92 | 11.18 | 30.9 | 7.34 | 12.648 |
| VS S&P | -2.16 | -1.19 | -4.82 | -1.49 | -6.35 | -3.202 |
| VARIX | 14.11 | 1.75 | 12.31 | 32.17 | 8.39 | 13.746 |
| VS S&P | -0.95 | -0.36 | -3.69 | -0.22 | -5.3 | -2.104 |
| EMNAX | -0.49 | -11.6 | 6.69 | 36.01 | -3.08 | 5.506 |
| VS S&P | -15.55 | -13.71 | -9.31 | 3.62 | -16.77 | -10.34 |
| EMNBX | -1.21 | -12.36 | 5.88 | 34.96 | -3.72 | 4.71 |
| VS S&P | -16.27 | -14.47 | -10.12 | 2.57 | -17.41 | -11.14 |
| EMNCX | -1.21 | -12.31 | 5.94 | 35.08 | -3.74 | 4.752 |
| VS S&P | -16.27 | -14.42 | -10.06 | 2.69 | -17.43 | -11.1 |
| VIMNX | -0.21 | -11.38 | 7.2 | 36.34 | -2.81 | 5.828 |
| VS S&P | -15.27 | -13.49 | -8.8 | 3.95 | -16.5 | -10.02 |
| VGPAX | — | — | 11.26 | 19.05 | -4.04 | 8.7567 |
| VS S&P | | | -4.74 | -13.34 | -17.73 | -11.94 |
| VGPCX | — | — | 10.35 | 18.35 | -4.81 | 7.9633 |
| VS S&P | | | -5.65 | -14.04 | -18.5 | -12.73 |
| VGPIX | — | — | 11.47 | 19.43 | -3.83 | 9.0233 |

FIRST AMENDED COMPLAINT

| | | | | | | |
|---|---|---|---|---|---|---|
| VS S&P | | | -4.53 | -12.96 | -17.52 | -11.67 |
| VAPAX | — | -0.21 | 10.05 | 29.24 | 1.79 | 10.218 |
| VS S&P | | -2.32 | -5.95 | -3.15 | -11.9 | -5.83 |
| VAPCX | — | -0.96 | 9.24 | 28.3 | 0.96 | 9.385 |
| VS S&P | | -3.07 | -6.76 | -4.09 | -12.73 | -6.663 |
| VAPIX | — | -0.02 | 10.31 | 29.58 | 2.03 | 10.475 |
| VS S&P | | -2.13 | -5.69 | -2.81 | -11.66 | -5.573 |

114.   In addition, investors lost money when the AlphaSector Funds began to decline in value over the course of 2014 and 2015. Numerous class members purchased AlphaSector Fund shares that were greater in price at the time of purchase than at the time of sale, or the value of the respective funds on the date that the Complaint was filed.

## XI.   Defendants' Breaches of Fiduciary Duty

115.   Defendants, as Directors, Officers, Advisors, or Sub-Advisor of VOT, each owed VOT a duty of loyalty and care.

116.   Defendants each breached those duties by virtue of their continued retention of F-Squared as a sub advisor, notwithstanding knowledge that F-Squared fabricated its performance.

117.   Defendants each breached their duties to VOT by causing the AlphaSector Funds to use the AlphaSector Strategy to trade assets for the mutual funds notwithstanding the fact that the advertised historic investment results had been back-tested and were therefore false.

118.   Defendants each breached their duties to VOT by falsely claiming that the AlphaSector Indicies had track records that dated back to 2001 when that was in fact not true.

119.   Due to these breaches of fiduciary duty, VOT's funds were invested in bogus trading strategies that systematically underperformed the S&P 500, wasting the assets of VOT and its investors, and preventing them from receiving the meaningful investment returns VOT would have earned had they utilized a

reliable investment strategy.

## XII.   Demand Futility Allegations

120.   As of this date, VOT's Board has seven Trustees.  Therefore, demand futility is established if it can be established with respect to four Trustees.

### A.   Demand is Futile as to Aylward

121.   Demand is futile as to Aylward because he faces a substantial likelihood of liability. Aylward breached his fiduciary duties to VOT by approving F-Squared as a sub-advisor, by including the AlphaSector Indices' false and misleading historical results in the AlphaSector Funds' prospectuses, and by utilizing the AlphaSector Strategy to trade despite its lack of historical track record. This conduct is not subject to the business judgment rule because, as set forth more fully above in the section related to Aylward's scienter, Aylward was well aware that the AlphaSector Strategy was based on fabricated results due to his participation in the Board's due dilligence.   Further supporting Aylward's knowledge is his awareness of red flags, including the fact that Newfound Research and F-Squared did not exist until 2006 and 2008, and the fact that Hoffstein, who invented the AlphaSector Strategy, was only 14 years old in 2001.   Aylward's knowledge can also be inferred from the fact that Batchelar announced that F-Squared's results were back-tested in a conference that Aylward attended by phone.  Further supporting Aylward's knowledge is his participation in the removal of the AlphaSector Indices results from the 2014 Registration Statement, and the deletion of documents from Virtus related to F-Squared.  In the alternative, if this conduct was not knowing, Aylward is nonetheless not subject to the protection of the business judgment rule because he therefore failed to make a fully informed decision.

### B.   Demand is Futile as to McLaughlin

122.   Demand is futile as to McLaughlin because he faces a substantial likelihood of liability. McLaughlin breached his fiduciary duties to VOT by

approving F-Squared as a sub-advisor, by including the AlphaSector Indices' false and misleading historical results in the AlphaSector Funds' prospectuses, and by utilizing the AlphaSector Strategy to trade despite its lack of historical track record. This conduct is not subject to the business judgment rule because, as set forth more fully above in the section related to McLaughlin's scienter, McLaughlin was well aware that the AlphaSector Strategy was based on fabricated results due to his participation in the Board's due dilligence.   Further supporting McLaughlin's knowledge is his awareness of red flags, including the fact that Newfound Research and F-Squared did not exist until 2006 and 2008, and the fact that Hoffstein, who invented the AlphaSector Strategy, was only 14 years old in 2001.  McLaughlin's knowledge can also be inferred from the fact that Batchelar announced that F-Squared's results were back-tested in a conference that numerous officers attended. Further supporting McLaughlin's knowledge is his participation in the removal of the AlphaSector Indices results from the 2014 Registration Statement, and the deletion of documents from Virtus related to F-Squared.  In the alternative, if this conduct was not knowing, McLaughlin is nonetheless not subject to the protection of the business judgment rule because he therefore failed to make a fully informed decision.

## C.    Demand is Futile as to McNamara

123.   Demand is futile as to McNamara because she faces a substantial likelihood of liability. McNamara breached her fiduciary duties to VOT by approving F-Squared as a sub-advisor, by including the AlphaSector Indices' false and misleading historical results in the AlphaSector Funds' prospectuses, and by utilizing the AlphaSector Strategy to trade despite its lack of historical track record. This conduct is not subject to the business judgment rule because, as set forth more fully above in the section related to McNamara's scienter, McNamara was well aware that the AlphaSector Strategy was based on fabricated results due to his participation in the Board's due dilligence.   Further supporting McNamara's

knowledge is her awareness of red flags, including the fact that Newfound Research and F-Squared did not exist until 2006 and 2008, and the fact that Hoffstein, who invented the AlphaSector Strategy, was only 14 years old in 2001. McNamara's knowledge can also be inferred from the fact that Batchelar announced that F-Squared's results were back-tested in a conference that numerous officers attended. Further supporting McNamara's knowledge is her participation in the removal of the AlphaSector Indices results from the 2014 Registration Statement, and the deletion of documents from Virtus related to F-Squared. In the alternative, if this conduct was not knowing, McNamara is nonetheless not subject to the protection of the business judgment rule because she therefore failed to make a fully informed decision.

### D.   Demand is Futile as to Oates

124.   Demand is futile as to Oates because he faces a substantial likelihood of liability. Oates breached his fiduciary duties to VOT by approving F-Squared as a sub-advisor, by including the AlphaSector Indices' false and misleading historical results in the AlphaSector Funds' prospectuses, and by utilizing the AlphaSector Strategy to trade despite its lack of historical track record. This conduct is not subject to the business judgment rule because, as set forth more fully above in the section related to Oates's scienter, Oates was well aware that the AlphaSector Strategy was based on fabricated results due to his participation in the Board's due dilligence. Further supporting Oates's knowledge is his awareness of red flags, including the fact that Newfound Research and F-Squared did not exist until 2006 and 2008, and the fact that Hoffstein, who invented the AlphaSector Strategy, was only 14 years old in 2001. Oates's knowledge can also be inferred from the fact that Batchelar announced that F-Squared's results were back-tested in a conference that numerous officers attended. Further supporting Oates's knowledge is his participation in the removal of the AlphaSector Indices results from the 2014 Registration Statement, and the deletion of documents from Virtus

FIRST AMENDED COMPLAINT

related to F-Squared.  In the alternative, if this conduct was not knowing, Oates is nonetheless not subject to the protection of the business judgment rule because he therefore failed to make a fully informed decision.

### E.     Demand is Futile as to Segerson

125.   Demand is futile as to Segerson because he faces a substantial likelihood of liability. Segerson breached his fiduciary duties to VOT by approving F-Squared as a sub-advisor, by including the AlphaSector Indices' false and misleading historical results in the AlphaSector Funds' prospectuses, and by utilizing the AlphaSector Strategy to trade despite its lack of historical track record. This conduct is not subject to the business judgment rule because, as set forth more fully above in the section related to Segerson's scienter, Segerson was well aware that the AlphaSector Strategy was based on fabricated results due to his participation in the Board's due dilligence.   Further supporting Segerson's knowledge is his awareness of red flags, including the fact that Newfound Research and F-Squared did not exist until 2006 and 2008, and the fact that Hoffstein, who invented the AlphaSector Strategy, was only 14 years old in 2001.  Segerson's knowledge can also be inferred from the fact that Batchelar announced that F-Squared's results were back-tested in a conference that numerous officers attended. Further supporting Segerson's knowledge is his participation in the removal of the AlphaSector Indices results from the 2014 Registration Statement, and the deletion of documents from Virtus related to F-Squared.  In the alternative, if this conduct was not knowing, Segerson is nonetheless not subject to the protection of the business judgment rule because he therefore failed to make a fully informed decision.

### F.     Demand is Futile as to Vredonck

126.   Demand is futile as to Vredonck because he faces a substantial likelihood of liability. Vredonck breached his fiduciary duties to VOT by approving F-Squared as a sub-advisor, by including the AlphaSector Indices' false

and misleading historical results in the AlphaSector Funds' prospectuses, and by utilizing the AlphaSector Strategy to trade despite its lack of historical track record. This conduct is not subject to the business judgment rule because, as set forth more fully above in the section related to Vredonck's scienter, Vredonck was well aware that the AlphaSector Strategy was based on fabricated results due to his participation in the Board's due dilligence.   Further supporting Vredonck's knowledge is his awareness of red flags, including the fact that Newfound Research and F-Squared did not exist until 2006 and 2008, and the fact that Hoffstein, who invented the AlphaSector Strategy, was only 14 years old in 2001.   Vredonck's knowledge can also be inferred from the fact that Batchelar announced that F-Squared's results were back-tested in a conference that numerous officers attended. Further supporting Vredonck's knowledge is his participation in the removal of the AlphaSector Indices results from the 2014 Registration Statement, and the deletion of documents from Virtus related to F-Squared.   In the alternative, if this conduct was not knowing, Vredonck is nonetheless not subject to the protection of the business judgment rule because he therefore failed to make a fully informed decision.

## XIII.  Class Action Allegations

127.   Plaintiffs bring this action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons who purchased shares of the AlphaSector Funds during the Class Period and were damaged thereby, excluding Defendants, the officers and directors of the Fund, members of the Defendants' immediate families and the Defendants' legal representatives, heirs, successors, and assigns, and any entity in which any of the Defendants have or had a controlling interest or unique contractual arrangement.

128.   The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery,

Plaintiffs believe that there are at least thousands of members in the proposed Class. Members of the Class may be identified from records maintained by the Fund, Virtus or their agents, and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

129.   Plaintiffs' claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

130.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

131.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.   whether the federal securities laws were violated by defendants' acts as alleged herein;

b.   whether statements made by defendants to the investing public during the Class Period misrepresented material facts and/or omitted to state material facts;

c.   to what extent the members of the Class have sustained damages and the proper measure of damages.

132.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

**XIV.  APPLICABILITY OF PRESUMPTION OF RELIANCE:**

133.   Plaintiffs allege their reliance should be presumed for any claim

asserted which requires a showing of reliance and that they are entitled to a presumption of reliance under each of the following theories:

## A.    Affiliated Ute

134.    Neither Plaintiff nor the Class need prove reliance - either individually or as a class because under the circumstances of this case, which involves a failure to disclose that F-Squared's data was back-tested and not based on actual trades, as described herein above, positive proof of reliance is not a prerequisite to recovery, pursuant to ruling of the United States Supreme Court in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered the omitted information important in deciding whether to buy or sell the subject security. As the Supreme Court explained, requiring plaintiffs to describe how they would have behaved had the omitted information been disclosed places an unrealistic burden on plaintiffs.

## B.    Fraud on the Regulatory Process

135.    The Fraud on the Regulatory Process presumption of reliance was created by the 9th Circuit in *Arthur Young and Co. v. United States District Ct.*, 549 F. 2d 686 (9th Cir. 1976), cert. denied, 434 U.S. 829 (1977). In its S-1 filing for its IPO, Virtus Opportunities Trust omitted to disclose material facts to the Securities & Exchange Commission and NASDAQ in applying for and obtaining permission to sell the AlphaSector Funds' securities to investors. VOT failed to disclose that the investment returns for the AlphaSector Strategy prior to 2009 were not actual investment returns but was backtested. Had it disclosed this fact, VOT never would have been able to sell its securities publicly to investors. Investors relied on the integrity of the regulatory process when purchasing AlphaSector Funds' securities. Defendants' omissions were a fraud on the regulatory process, permitting Plaintiffs a presumption of reliance.

## C.    FIRST ALLIANCE DOCTRINE

136.   Class treatment is appropriate where fraud is consummated through a unified marketing strategy that relied on the omissions or misrepresentations contained herein. *In re First Alliance Mortgage Co.*, 471 F.3d 977, 991 (9th Cir. 2006). Defendants uniformly implemented a misleading marketing strategy that caused investors to believe that the AlphaSector strategy was validated by live trading since 2001. Because of that "orchestrated strategy" and the uniformity among the misrepresentations, reliance can be inferred.

**Count I:     Violations of §10(b) of the Exchange Act and Rule 10b-5(b) Against Aylward, Bradley, Keith, Mcloughlin, McNamara, Oates, Segerson, and Verdonck**

137.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

138.   This claim is asserted against Aylward, Bradley, Keith, McLoughlin, McNamara, Oates, Segerson, and Verdonck, each of whom signed the false and misleading registration statements for the Alpha Sector Funds during the Class Period (the "Signatory Defendants.").

139.   The Signatory Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Virtus's ostensible growth in business, assets under management, revenues and profits from the AlphaSector Funds, their prior track record and regulatory compliance, as specified herein.

140.   The Signatory Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the AlphaSector Strategy's prior track record and regulatory compliance, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary

in order to make the statements made about Virtus and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of AlphaSector Mutual Funds during the Class Period.

141.   Each of the Signatory Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Signatory Defendants were high-level executives and/or directors at Virtus, VIA and VOT during the Class Period and members of these entities' management team or had control thereof; (ii) each of these Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Virtus, VIA and VOT was privy to and participated in the creation, development and reporting of the Virtus and its subsidiaries' periodic disclosures to investors; (iii) each of these Defendants had access to information which would have revealed the fraud behind the AlphaSector Funds, and the duty to discover the fraud; and (iv) each of these Defendants was aware of VOT's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

142.   The Signatory Defendants had actual knowledge of misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing from the investing public the fraudulent nature of the claims regarding the AlphaSector Strategy. As demonstrated by the allegations above, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

143.   As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the value AlphaSector Funds was artificially inflated during the Class Period. In ignorance of the fact that value of the AlphaSector Funds was artificially inflated, and relying directly or indirectly on the false and misleading statements made by First Claim Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Signatory Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired securities of the AlphaSector Funds during the Class Period at artificially high prices and were damaged thereby.

144.   At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Virtus, which was not disclosed by the Signatory Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired shares of the AlphaSector Funds, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

145.   By virtue of the foregoing, the Signatory Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

146.   As a direct and proximate result of the Signatory Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of Virtus' stock during the Class Period.

147.   This action was filed within two years of discovery of the fraud and within five years of each Lead Plaintiff's purchases of securities giving rise to the cause of action.

**Count II:     Violations of §20(a) of the Exchange Act Against the Individual Defendants**

148.   Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

149.   The Individual Defendants acted as controlling persons of VOT within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of VOT's operations and/or intimate knowledge of the false and misleading investment results of the AlphaSector Funds filed with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiff contends are false and misleading. The Individual Defendants were provided with or had unlimited access to copies of VOT's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

150.   In particular, each of these defendants had direct and supervisory involvement in the day-to-day operations of VOT and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

151.   VOT violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

152.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases of the

1  Company's mutual funds during the Class Period.

2      153.   This action was filed within two years of discovery of the fraud and

3  within five years of each Lead Plaintiff's purchases of securities giving rise to the

4  cause of action.

5  **Count III:   Violation Of Section 11 of the Securities Act Against All**

6  **Defendants**

7      154.    Plaintiffs repeat and realleges each and every allegation contained

8  above as if fully set forth herein.

9      155.   The claim is brought pursuant to Section 11 of the Securities Act

10 against defendants. This claim is not based on and does not sound in fraud.

11     156.   This claim is brought by Plaintiffs on behalf of other members of the

12 Class who acquired any AlphaSector Funds' shares pursuant to prospectuses dated

13 October 1, 2009, January 28, 2010, January 27, 2011, January 27, 2012 January

14 25, 2013, and January 28, 2014 (collectively the "Prospectus") all of which were

15 filed with the SEC as part of registration statements (the "Registration

16 Statements"). Each Class member acquired their shares pursuant to the Prospectus

17 and Registration Statements.

18     157.   The Signatory Defendants signed, either personally or through an

19 attorney-in-fact, the Registration Statements.

20     158.   Defendants owed to the purchasers of the stock obtained through the

21 Registration Statement and Prospectus the duty to make certain that all relevant

22 material risk factors potentially affecting the Fund's performance be disclosed in

23 the Registration Statements at the time the Registration Statements became

24 effective to ensure that such statements were true and correct and that there was no

25 omission of material facts required to be stated in order to make the statements

26 contained in the Registration Statements not misleading.

27     159.   None of the Defendants named in this Count made a reasonable

28 investigation or possessed reasonable grounds for the belief that the statements

contained in the Registration Statement and Prospectus were true or that there was no omission of material facts necessary to make the statements made therein not misleading.

160.   Defendants issued and disseminated, caused to be issued and disseminated, and participated in the issuance and dissemination of, material misstatements to the investing public which were contained in the Registration Statements and Prospectus, which misrepresented or failed to disclose, inter alia, the facts set forth above. By reason of the conduct therein alleged, each Defendant violated Section 11 of the Securities Act.

161.   VOT is the issuer of the stock sold via the Registration Statements and Prospectus. As issuer of the stock, these defendants are strictly liable to the Plaintiffs and the Class for the material misstatements and omissions therein.

162.   At the times they obtained their shares of the Fund, the Plaintiffs and members of the Class did so without knowledge of the facts concerning the misstatements or omissions alleged herein.

163.   This action is brought within one year after discovery in this or a related action of the untrue statements and omissions in and from the Registration Statements and Prospectus that should have been made through the exercise of reasonable diligence, and within three years of the time that the securities upon which this Claim is brought were offered to the public.

164.   By virtue of the foregoing, the Plaintiffs and the other members of the Class are entitled to damages under Section 11 as measured by the provisions of Section 11(e), from the Defendants and each of them, jointly and severally.

**Count IV:   Violation Of Section 12(a)(2) of the Securities Act Against All Defendants**

165.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

166.   This claim is brought for violations of Section 12(a) (2) of the

Securities Act against all Defendants.

167.   As set forth above, the Prospectus failed to disclose material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

168.   Defendants all "solicited" purchases of the Funds' shares by means of a prospectus or were controlling persons of the Fund or of those who solicited purchases of the Fund's shares.

169.   Plaintiff and other members of the Class did not know, nor could they have known, of the untruths or omissions contained in the Registration Statement and Prospectus, including that the price of the Fund's shares were not properly determined.

170.   The Defendants named in this Claim were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading. None of the Defendants named in this Claim made a reasonable investigation nor possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects.

171.   This claim was brought within one year after discovery in this or a related action of the untrue statements and omissions in and from the Prospectus that should have been made through the exercise of reasonable diligence, and within three years of the time that the securities upon which this Claim is brought were offered to the public by way of a Prospectus.

172.   By reason of the misconduct alleged herein, the Defendants named in this Count violated Section 12(a)(2) of the Securities Act and are liable to Plaintiff and other members of the Class who purchased or acquired the Fund's shares by way of the Prospectus, each of whom has been damaged as a result of such violations.

FIRST AMENDED COMPLAINT

173.   Plaintiff and the other members of the Class who purchased the Fund's shares pursuant to the Prospectus hereby seek rescission of their purchases and hereby tender to the defendants named in this Count those shares, which the Plaintiffs and other members of the Class continue to own, in return for the consideration paid for those securities, together with interest thereon.

**Count V:   Violation Of Section 15 of the Securities Act Against All Defendants**

174.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

175.   This claim is asserted against all Defendants which by virtue of being VOT's managers and responsible for choosing VOT's investments and handling its day-to-day business were control persons of VOT during the relevant time period. Defendants were in a position to control and did control, the inclusion of the false and incomplete statements and omissions in the Registration Statement and Prospectus.

176.   For the reasons set forth above, Defendants are liable to the Plaintiffs and the members of the Class who purchased VOT's shares based on the untrue statements and omissions of material fact contained in the Registration Statement and Prospectus, pursuant to Section 11 of the Securities Act, and were damaged thereby.

177.   Defendants did not make a reasonable investigation nor possess reasonable grounds for the belief that the statements contained in the Registration Statement and Prospectus were accurate and complete in all material respects. Had it exercised reasonable care, they could have known of the material misstatement and omissions alleged herein.

178.   This claim was brought within one year after the discovery of the untrue statements and omissions in the Registration Statement and Prospectus and within three years after the Fund's shares were sold to the Class in connection with

the Offering.

179.   By reason of the misconduct alleged herein, for which the Fund is primarily liable, as set forth above, Defendants are jointly and severally liable with and to the same extent as the Fund pursuant to the Securities Act.

**Count VI:   Breach of Fiduciary Duty Against All Defendants**

180.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.   Each Defendant owed to VOT the duty to exercise candor, good faith, and loyalty in the management, administration, and control of VOT's business and affairs.

182.   Each of the Defendants violated and breached his, her, or its fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

183.   Defendants' conduct set forth herein was due to their intentional, reckless, or negligent breach of the fiduciary duties they owed to VOT as alleged herein. The Defendants intentionally, recklessly, or negligently breached or disregarded their fiduciary duties to protect the rights and interests of VOT.

184.   In breach of their fiduciary duties owed to VOT, the Defendants willfully participated in misrepresentation of wisdom of relying on the AlphaSector Strategy and on using F-Squared as a sub-advisor.

185.   Defendants had actual or constructive knowledge that they had caused VOT to improperly misrepresent the AlphaSector Strategy's track record, and the fact that F-Squared was employed as a sub-advisor despite orchestrating these representations.

186.   These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

187.   Defendants were at least grossly negligent for continuing to employ F-Squared and the AlphaSector Strategy, and for publishing and not correcting the

false track records of the AlphaSector Indices.

188.   As a direct and proximate result of Defendants' breaches of their fiduciary obligations, VOT has sustained and continues to sustain substantial damages. As a result of the misconduct alleged herein, Defendants are liable to VOT.

189.   Defendants' misconduct alleged herein also constituted an abuse of their ability to control and influence VOT, for which they are legally responsible.

190.   As a direct and proximate result of the Defendants' abuse of control, VOT has sustained substantial damages. As a direct and proximate result of Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, VOT has sustained and continues to sustain substantial damages. As a result of the misconduct alleged herein, the Defendants are liable to VOT.

191.   By their actions alleged herein, Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of VOT in a manner consistent with the operations of a publicly-held corporation.

192.   As a direct and proximate result of Defendants' gross mismanagement and breaches of duty alleged herein, VOT has sustained, and will continue to sustain, substantial damages.

193.   Plaintiff, on behalf of VOT, has no adequate remedy at law.

**WHEREFORE**, plaintiff prays for relief and judgment, as follows:

a.   Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

b.   Awarding damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including

interest thereon;

        c.     Awarding Plaintiff and the other members of the Class rescission on Claim I, II, and V to the extent they still hold Fund shares, or if sold, awarding rescissory damages; and

        d.     Such other and further relief as the Court may deem just and proper.

## XV.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: October 1, 2015                         Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

/s/ Laurence M. Rosen, Esq.
Laurence M. Rosen, Esq. (SBN 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684

Email: lrosen@rosenlegal.com

FIRST AMENDED COMPLAINT

**VERIFICATION**

I, Frances Briggs, am a Plaintiff in the above entitled action, I have read the foregoing complaint and know the contents thereof, and the same is true to my own knowledge, except as to matters therein stated to be alleged on information and belief and as to those matters I believe it to be true.

     I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct. Executed this ___ day of _October_ .

_Frances Briggs_
Frances Briggs